IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ALTON LUMPKIN, et al.,

    Plaintiffs,

      v.

L. IRWIN
a police officer for the City of Atlanta,
individually, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:11-CV-1471-TWT

ORDER

    This is a civil rights action. It is before the Court on the Defendants' Motion

to Strike [Doc. 53] and the Defendants' Motion for Summary Judgment [Doc. 41].

For the reasons set forth below, the Court DENIES the Defendants' Motion to Strike

and GRANTS IN PART and DENIES IN PART the Defendants' Motion for Summary

Judgment.

## I. Background

    The facts underlying this action are as follows according to the Plaintiffs: On

September 2, 2009, according to Jeffery Lumpkin, he was outside of his brother's

house cleaning the interior of his car. (J. Lumpkin Dep., at 35.) While cleaning his car,

Lumpkin said that he was playing the music in his car "just factory, about 5, volume

5 or 6, just factory." (J. Lumpkin Dep., at 35.) According to Lumpkin, he was watching the police officers exit their cars preparing to search a nearby house. (J. Lumpkin Dep., at 27.) After the Atlanta Police Department had completed a drug bust at the house across the street, Defendant Officer Luke Irwin came to Plaintiff Jeffery Lumpkin's gate and yelled "Turn that damn radio down or I will come turn the radio down for you." (J. Lumpkin Aff. ¶ 11; Crystal Barnes Bond Hearing Testimony of October 12, 2009 ("Barnes Testimony"), at 14.) Jeffery Lumpkin then turned the radio down. (Id.) Officer Irwin walked back across the street and spoke to Defendant Officer Brandon Robinson. Officer Robinson then came to the gate outside Jeffery Lumpkin's property, and called Jeffery to come to the gate where he was; Jeffery did not go to the gate, but remained where he was at the back of his car in the driveway. (J. Lumpkin Aff. ¶ 20; Barnes Testimony, at 14.)

After Jeffery Lumpkin did not go to the gate where Officer Robinson was, Robinson kicked the gate opened and went to where Jeffery Lumpkin was standing behind his car and began poking him in his chest with his finger and bumping him with his shoulder and said "I'll show you what happen when you don't obey a police officer." (J. Lumpkin Aff. ¶ 20; Barnes Testimony, at 14.) Jeffery Lumpkin backed up against his car trying to get away from Officer Robinson's assault. When he was up against his car and could not go any further, Officer Robinson poked him in his

chest with his finger and again bumped him with his shoulder and said "you are a smart ass, let's see what you gonna do." Officer Robinson had his nightstick in his hand and Jeffery Lumpkin did not want to give Robinson an excuse to hit him with the nightstick. Officer Robinson turned as if he was leaving and then turned back quickly and struck Jeffery Lumpkin in the eye with his fist, while holding his baton. (J. Lumpkin Aff. ¶¶ 20-23; Barnes Testimony, at 15.) Jeffery Lumpkin slid to the ground from Officer Robinson's blow to his eye. After Jeffery was on ground, Robinson struck him again and Officer Irwin came into the yard and he struck Jeffery Lumpkin on his side while he was on the ground not resisting. Jeffery Lumpkin was able to protect his head from the blows until Officer Robinson had cuffed him; after he was handcuffed Officer Irwin struck Jeffery Lumpkin on his hand with his baton. (J. Lumpkin Aff. ¶¶ 23-26.) After Jeffery Lumpkin was beaten and handcuffed, Officer Robinson grabbed Jeffery's dreadlocks and began dragging him toward the street; Robinson continued to drag him until seven of his dreadlocks came from his head. Officer Robinson threw his hair onto the ground and then Robinson and another officer dragged him to a patrol car. (J. Lumpkin Aff. ¶ 27.) From the time Jeffery Lumpkin encountered these Defendants he had not been out of his brother's yard until they dragged him out into the street after he had been beaten. (J. Lumpkin Aff. ¶ 28.)

Plaintiff Alton Lumpkin was inside his house when the police first came to his gate and only learned about what was happening when Crystal Barnes came to the porch. (A. Lumpkin Aff. ¶ 5.) Alton came to the porch and saw a number of police officers beating his brother Jeffery Lumpkin while he was on the ground. (A. Lumpkin Aff. ¶ 6.) Alton ran down the steps yelling for them to stop beating his brother. Just as he got to the bottom of the steps a white officer, who he later learned to be Officer Irwin, grabbed him and with the help of other officers threw him to the ground and began beating him. At one time Officer Irwin had his knee in Alton's back while he pushed Alton's head into the ground and continually punched Alton's side. The officers continued to beat Alton Lumpkin after he was on the ground and handcuffed. (A. Lumpkin Aff. ¶¶ 8-9; Barnes Testimony, at 15.) After they had beaten Alton, Alton was searched and taken to the patrol car where his brother Jeffery Lumpkin was. Officer Irwin looked into the window of the patrol car and told Jeffery and Alton that they would be taken to Grady Hospital. Irwin said that when they got home from the hospital that they should forget about what had happened. Alton Lumpkin responded, "Hell No! you want not the way you beat us up." (A. Lumpkin Aff. ¶¶ 13-14.)

The Lumpkins were taken to Grady Hospital to get treatment for their injuries and afterwards they were taken to the Fulton County Jail. (J. Lumpkin Aff. ¶¶ 32, 33; A. Lumpkin Aff. ¶ 16.) Jeffery's eye socket was crushed and the middle finger on his

right hand was broken. He was cleared by the medical personnel at Grady and he was taken to Fulton County jail. Jeffery continued to have problems with his eye and his hand. On September 23, 2009, he was taken to Grady Hospital and they performed surgery on his hand that day. The doctor implanted a rod in his middle finger and secured it with screws. (J. Lumpkin Aff. ¶¶ 32-36.) On October 12, 2009, 40 days after Alton Lumpkin was arrested, he was allowed to sign his own bond and was released from Fulton County jail. On October 14, 2009, 42 days after he was arrested, Jeffery Lumpkin was allowed to sign his own bond and was released from Fulton County jail. (J. Lumpkin Aff. ¶ 37.)

Jeffery Lumpkin learned while in jail that he had been charged with Obstruction of Law Enforcement Officer; Cruelty to Children in the Third Degree; Terroristic Threats; Disorderly Conduct; and Public Drunkenness.  Jeffery Lumpkin denies obstructing either of the Defendants or any other Atlanta Police officer on September 2, 2009.  He denies committing the act of cruelty to children, because he did not curse or call the officers any names while they were at the gate or inside his brother's property. (J. Lumpkin Aff. ¶ 9.) At no time did Jeffery Lumpkin threaten any of the officers with harm while they were at the fence gate or after they came onto the property, and at no time did Jeffery Lumpkin throw anything at the Atlanta Police officers on September 2, 2009. (Barnes Testimony, at 14.) At no time was Jeffery or

Alton Lumpkin disorderly before or during the time they encountered the police officer. (Barnes Testimony, at 14-15.) Jeffery Lumpkin did not drink in public and was not under the influence of alcohol during the events in question. (J. Lumpkin Aff. ¶ 28.) On August 3, 2010, all charges were dismissed against Jeffery Lumpkin and Alton Lumpkin. (J. Lumpkin's Aff. ¶¶ 39-40.)

The Defendants tell a very different story. Their version is: On September 2, 2009, at approximately 7:30 p.m., Officers Irwin and Robinson were part of a group of police officers gathered at the 2100 block of Polar Rock Place in Atlanta, Georgia to conduct a search, pursuant to a search warrant of a house in that neighborhood. Jeffery Lumpkin was staying at the home of his brother, Alton Lumpkin, at 2167 Polar Rock Place. After serving the warrant, Officer Irwin went back to the police vehicles to retrieve an evidence box. While retrieving the box, Officer Irwin could hear Jeffery Lumpkin playing the music from his car. (Irwin Aff. ¶ 5.) Without going onto the property at 2167 Polar Rock Place, Officer Irwin asked Jeffery Lumpkin to turn down his music.

After instructing Mr. Lumpkin to turn down his music, Officer Irwin began to walk back toward the house at which the police served the warrant. In response to his instructions to turn down the music, Officer Irwin states that he was called a "cracker" and "honky." Officer Irwin says Mr. Lumpkin then stated, "I ain't got to do shit, I'm

on my motherfucking property…. you can't tell me what the fuck to do on my damn property." There were young children present in the area when Jeffery Lumpkin cursed Officer Irwin. (Irwin Aff. ¶ 6.) Officer Brandon Robinson was at the location in connection with the search warrant. Officer Robinson had also asked Jeffery Lumpkin to lower the volume of his music. (Robinson Aff. ¶ 6.) At this time, Officer Robinson had not come onto the property where Jeffery Lumpkin was standing. In response to Officer Robinson's request, Jeffery Lumpkin called Officer Robinson "Uncle Tom" and "pussy ass nigger." (Irwin Aff. ¶ 7; Robinson Aff. ¶ 6.) Going a step further, Jeffery Lumpkin then threw a bottle of beer in the direction of Officer Robinson toward a fence where Officer Robinson was standing and stated, "I'll kick your ass… I'll kill ya nigger, this is my motherfucking property… if you come on this property I'm going to fuck you up." (Irwin Aff. ¶ 7; Robinson Aff. ¶ 7.) Officer Irwin was now slightly behind Officer Robinson—still not on the Lumpkin property.

Based upon Jeffery Lumpkin's refusal to lower the volume of his music, throwing the beer bottle and his loud, threatening and vulgar language, Officer Robinson came on the Lumpkin property. (Robinson Aff. ¶ 7.) Upon entering the property, Jeffery Lumpkin got into a fighting stance toward Officer Robinson and repeatedly asked, "What you going to do now?" (Robinson Aff. ¶ 7; J. Lumpkin Dep., at 31-32.) Jeffery Lumpkin then threw a punch at Officer Robinson and a physical

struggle began. (Robinson Aff. ¶ 7; Irwin Aff. ¶ 7.) Officer Irwin, upon seeing that Jeffery Lumpkin was not going to comply with Officer Robinson's initial directives and was attempting to punch Officer Robinson, headed back toward the property. Again, Officer Irwin was slightly behind Officer Robinson when Jeffery Lumpkin shouted obscenities and threw the beer bottle. As Officer Irwin approached the scuffle, he noticed that Alton Lumpkin, Jeffery Lumpkin's brother, ran from inside of the house screaming at the officers and attempted to get into the struggle between Jeffery Lumpkin and Officer Robinson. (Compl. ¶ 72.) Officer Irwin pushed Alton Lumpkin away from Officer Robinson and told him to stand away as Officer Irwin was going to assist in subduing Jeffery Lumpkin. Alton Lumpkin's response to these commands was to punch Officer Irwin in the left ear. (Irwin Aff. ¶ 9.) Jeffery Lumpkin admitted that Alton Lumpkin got involved by yelling to the officers, "Get off of my brother, get off of my brother." (J. Lumpkin Dep., at 65.)

During the scuffle, Officer Irwin deployed his baton and struck Alton Lumpkin's left leg. While Officer Irwin was deploying his baton and preparing to strike Alton, Alton escalated his attack upon Officer Irwin by attempting to tackle Irwin and grab Irwin's holstered gun. Officer Irwin dropped to the ground on his right side (the side holding his gun) in an attempt to prevent Alton Lumpkin from actually grabbing the gun. Alton Lumpkin managed to pull Officer Irwin's gun magazine from

his work belt and began using the magazine as improvised brass knuckles by striking Officer Irwin in the testicles. (Irwin Aff. ¶ 9.) In defense, Officer Irwin struck Alton Lumpkin with his baton. Eventually, with the aid of other officers on the scene, Jeffery Lumpkin and Alton Lumpkin were subdued and placed under arrest. At the time of their arrests, both Lumpkins smelled of alcohol. (Irwin Aff. ¶ 11.) Both Lumpkins were charged with obstructing or hindering law enforcement officers, while Jeffery Lumpkin was charged with terroristic threats, using fighting words in the presence of a child under the age of fourteen, public drunkenness, and cruelty to children. Alton Lumpkin was charged with attempting to remove an officer's firearm, aggravated assault, battery and cruelty to children.

Jeffery Lumpkin alleges that he suffered a broken nose, a crushed eye socket, a broken finger, injuries to his knees, thighs and lost of seven dreadlocks of hair as a result of the confrontation on September 2, 2009. (J. Lumpkin Dep., at 50-51, 55-57.) Plaintiffs Jeffery Lumpkin and Alton Lumpkin have alleged excessive force against the Defendants, yet Jeffery Lumpkin admitted that he cannot identify the persons who injured him. (J. Lumpkin Dep., at 55-57.)

Both Jeffery Lumpkin and Alton Lumpkin were indicted by a grand jury for the incident of September 2, 2009. (Compl. ¶¶ 53, 83.) The charges were *nolle prossed* on August 3, 2010. (Compl. ¶¶ 62, 92.) Importantly, Brandon Robinson had no

interaction (physical or verbal) with Alton Lumpkin and/or Ieshia Lumpkin. As for Luke Irwin, other than his initial verbal exchange with Jeffery Lumpkin, his contact was only with Alton Lumpkin (none with Ieshia Lumpkin) against whom he was forced to defend himself.

The Plaintiffs filed the Complaint on May 5, 2011 [Doc. 1]. The Defendants filed this Motion for Summary Judgment on May 2, 2012 [Doc. 41], and this Motion to Strike the Testimony of Crystal Barnes and the Affidavit of Jeffery Lumpkin on June 25, 2012 [Doc. 53]. The Court considers the Motion to Strike first, and then turns to the Motion for Summary Judgment.

## II. Motion for Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond

the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

### A.    Motion to Strike

The Defendants move to strike Jeffery Lumpkin's Affidavit and Crystal Barnes' Bond Hearing Testimony.  The Defendants argue that Crystal Barnes' Testimony should be excluded because Jeffery Lumpkin did not mention in his deposition that she  was present during the events in question.  While a jury may find that Barnes' testimony should be given less weight as a result, it does not make Barnes' testimony inadmissible.  The Defendants argue that Jeffery Lumpkin's Affidavit should be excluded because in it he "seeks to plug the gaping holes created by his deposition testimony."  (Defs.' Reply Br. in Supp. of Defs.' Mot. for Summ. J., at 5.)  For example, the Defendants point out that in his deposition, Jeffery Lumpkin could not identify who crushed his eye socket, who broke his finger, or who pulled out his hair. (Id.)  However, in his affidavit, Jeffery Lumpkin is now able to identify who caused his injuries.  Again, any discrepancy between Jeffery Lumpkin's deposition testimony and his affidavit may be considered by a factfinder who is determining the credibility of the affidavit.  But, the Court will not exclude the affidavit because it conflicts with other evidence.

The Statement of Facts in the Plaintiffs' Response Brief (at 2-8) closely resembles the Complaint. The Defendants point out that the Affidavit states that Officer Robinson punched Jeffery Lumpkin in the eye, which the Defendants argue carries "[t]he implication...that Officer Robinson is responsible for Jeffery Lumpkin's crushed eye socket." Yet, the Complaint already blames Officer Robinson for crushing Jeffery Lumpkin's eye socket, albeit with his baton rather than his fist. (Compl. ¶ 37.) The Affidavit does fill in some details omitted by the Complaint, but certainly does not "assert a brand new, unpleaded set of facts and circumstances." Schambeau Props., L.P. v. Waffle House, Inc., Civ. Act. 11-0029-WS-B, 2011 U.S. Dist. LEXIS 149607, at *20 (S.D. Ala. 2011). This case has always been about the events of September 2, 2009 at the Lumpkins' residence, since the Complaint and through the Plaintiffs' Response to the Defendants' Motion for Summary Judgment. The Complaint gave the Defendants fair warning of the Plaintiffs' theories and facts underlying this action. While a factfinder may choose to discredit Crystal Barnes' Testimony and Jeffery Lumpkin's Affidavit after reviewing Jeffery Lumpkin's deposition testimony, these pieces of evidence are still admissible.

B.     Motion for Summary Judgment

   1.     Aggravated Assault

Count X of the Complaint is for aggravated assault.  Aggravated assault is a

criminal offense, as defined by O.C.G.A. § 16-5-21.  The Plaintiffs have no private

right of action against the Defendants for aggravated assault.  Evans v. Assocs., Inc.

v. Continental Homes, Inc., 785 F.2d 897, 912-13 (11th Cir. 1986).  The Defendants

are entitled to summary judgment on this claim.

   2.     Civil Conspiracy

The Plaintiffs claim that Officers Robinson and Irwin conspired to inflict

physical harm upon Jeffery Lumpkin.  "To recover damages for a civil conspiracy

claim, a plaintiff must show that two or more persons, acting in concert, engaged in

conduct that constitutes a tort."  Wright v. Apartment Inv. and Management Co., 315

Ga. App. 587, 595 (2012), quoting Mustaqeem-Graydon v. SunTrust Bank, 258 Ga.

App. 200, 207(6) (2002).  Jeffery Lumpkin swears that Officers Robinson and Irwin

had a conversation while directly looking at him, which was immediately followed by

Officer Robinson walking back to Jeffery Lumpkin's gate, and then Officer Robinson

proceeding to assault him.  (J. Lumpkin Aff. ¶¶ 16-17.)  The Defendants argue that

"[w]ithout specific allegations of what acts Defendants discussed, there can be no

conspiracy."  (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 24.)  The Court

disagrees; the Plaintiffs do not have to present evidence of the substance of the Defendants' conversation to furnish evidence of a conspiracy:

> Civil conspiracy is an act which is by its very nature covert and clandestine, and usually not susceptible of proof by direct evidence. Concert of action, amounting to conspiracy, may be shown by circumstantial as well as direct evidence. It is not necessary to prove an express agreement or compact among the wrongdoers; their common design may be inferred from the nature of the acts done, the relation between them, their mutual interests in the matter, and other circumstances.

Wright, 315 Ga. App. at 595, quoting First Federal Savings Bank v. Hart, 185 Ga. App. 304, 305(2) (1987). Jeffery Lumpkin's Affidavit provides circumstantial evidence of a conspiracy between Officers Robinson and Irwin. If a jury were to find Jeffery Lumpkin's testimony credible, it could reasonably infer from the testimony and the officers' actions during and after the conversation that the officers agreed to engage in tortious conduct. Therefore, the Defendants are not entitled to summary judgment on this claim.

### 3. False Arrest

False arrest occurs when a plaintiff is arrested maliciously and without probable cause. O.C.G.A. § 51-7-1. Viewed in the light most favorable to the Plaintiffs, there is evidence to support the Plaintiffs' claim that they were arrested maliciously and without probable cause.

### 4. Malicious Prosecution

Under Georgia law, "[a] criminal prosecution which is carried on maliciously and without any probable cause and which causes damage to the person prosecuted shall give him a cause of action." O.C.G.A. § 51-7-40. A grand jury indictment constitutes *prima facie* evidence that probable cause existed for the prosecution. Kelly v. Serna, 87 F.3d 1235, 1241 (11th Cir. 1996), citing Agbonghae v. Circuit City Stores, Inc., 214 Ga. App. 561, 563 (1994). "[T]he grand jury's return of the indictment against the [Plaintiffs] is prima facie but not conclusive evidence that probable cause existed for the prosecution. Thus, the burden shift[s] to [the Plaintiffs] to come forward with specific facts tending to show that probable cause did not exist for [their] arrest[s] and that the charges against [them] were instead motivated by malice." Agbonghae, 214 Ga. App. at 563. Viewed in the light most favorable to the Plaintiffs, there is evidence supporting their assertion that probable cause did not exist for their arrests and that the charges were motivated by malice. A grand jury indictment is not conclusive on the matter of probable cause, as a jury conviction in the absence of fraud would have been. Kelly, 87 F.3d at 1241, citing Monroe v. Sigler, 256 Ga. 759 (1987). Thus, this claim survives summary judgment.

5.     Excessive Force

The excessive force standard is based on reasonableness. It looks to the need for force, the amount of force used, and the injury inflicted. Jones v. City of Dothan,

121 F.3d 1456, 1460 (11th Cir. 1997). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham v. Conner, 490 U.S. 386, 396 (1989), quoting United States v. Place, 462 U.S. 696, 703 (1983). According to Jeffery Lumpkin's Affidavit and Crystal Barnes' Testimony, the Defendants had no need for force and there were no countervailing governmental interests at stake because the Defendant Officers conspired and acted to maliciously injure and arrest two law-abiding citizens. Viewed in the light most favorable to the Plaintiffs, there is a genuine issue of material fact, and summary judgment on this claim is inappropriate.

6.      Qualified Immunity

42 U.S.C. § 1983 provides a private cause of action for persons whose rights under the federal Constitution have been violated under color of state law. In response to the Plaintiffs' claim that the Defendants deprived them of rights, privileges, or immunities secured by the Constitution or laws of the United States, the Defendants have asserted the defense of qualified immunity. Qualified immunity shields government officials executing discretionary responsibilities from civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.  <u>Courson v. McMillian</u>, 939

F.2d 1479, 1487 (11th Cir. 1991), citing <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818

(1982).  Qualified immunity is a question of law to be decided by the Court. The test

for qualified immunity is one of "objective-reasonableness" in evaluating the conduct

of the government official claiming its protection.  "[A]ll but the plainly incompetent

or those who knowingly violate the law" find protection in qualified immunity.  <u>Id.</u>,

citing <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).

In <u>Rich v. Dollar</u>, 841 F.2d 1558 (11th Cir. 1988), the Eleventh Circuit adopted

a two part analysis for assessing the qualified immunity defense.  First, the defendant

public official must prove that he acted within the scope of his discretionary authority

when the challenged conduct occurred.  If the defendant satisfies this part, the burden

shifts to the plaintiff to show that the defendant public official's conduct violated

clearly established law.  <u>Id.</u> at 1563-64.

With the facts viewed in the light most favorable to the Plaintiffs, the

Defendants conspired and proceeded to assault, batter, arrest, and prosecute innocent

civilians.  This conduct would infringe upon "the very core of what the Fourth

Amendment prohibits," and would violate clearly established law. <u>Vinyard v. Wilson</u>,

311 F.3d 1340, 1355 (11th Cir. 2002).  The Defendants are not entitled to qualified

immunity for any of the Plaintiffs' claims on summary judgment.

7. <u>Official Immunity</u>

The Defendants seek official immunity for the alleged violations of state law. The Georgia Constitution sets forth the doctrine of sovereign immunity. Ga. Const. art. I, 2, ¶ IX. Pursuant to this constitutional provision, cities and counties are absolutely immune from suit for tort liability, unless that immunity has been specifically waived by "an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." <u>Gilbert v. Richardson</u>, 264 Ga. 744, 747 (1994); <u>see</u> <u>also</u> O.C.G.A. § 36-1-4 ("A county is not liable to suit for any cause of action unless made so by statute."). Sovereign immunity also bars claims against officials in their official capacity, <u>Cameron v. Lang</u>, 274 Ga. 122, 126 (2001), and in their individual capacity, pursuant to the doctrine of official immunity. <u>Gilbert</u>, 264 Ga. at 750. Official immunity precludes hindsight review of an official's judgment and allows public employees to retain independence of action without fear of becoming personally liable. <u>Gilbert</u>, 264 Ga. at 750. A public officer may be personally liable for negligently performing ministerial acts. However, under the doctrine of official immunity, an official is immune from liability for discretionary acts performed within the scope of his official authority if the actions are done without willfulness, malice, or corruption. <u>Cameron</u>, 274 Ga. at 123.

Actual malice, in the context of official immunity, is equated with "express malice or malice in fact" and requires a showing of "deliberate intention to do wrong." Adams v. Hazelwood, 271 Ga. 414, 414-15 (1999); Merrow v. Hawkins, 266 Ga. 390, 391 (1996). Mere proof of ill will, anger, frustration, or irritation is insufficient to establish actual malice. Adams, 271 Ga. at 415; Woodward v. Gray, 241 Ga. App. 847, 851 (2000). Rather, the plaintiff must show that the public officer acted with the deliberate intent to commit a wrongful act or with the deliberate intent to harm the plaintiff. Anderson v. Cobb, 258 Ga. App. 159, 160 (2002) (citing Adams, 271 Ga. at 415); see Kidd v. Coates, 271 Ga. 33, 33-34 (1999) (defining "actual intent to cause injury" as "an actual intent to cause harm to the plaintiff" encompasses concept of willfulness, malice, or corruption in the context of official immunity). Here, viewed in the light most favorable to the Plaintiffs, Jeffery Lumpkin's Affidavit and Crystal Barnes' Testimony create a genuine issue of material fact regarding whether the Defendants acted with deliberate intent to harm the Plaintiffs. Therefore, the Defendants are not entitled to official immunity at the summary judgment stage.

8.    Consortium

Plaintiff Ieshia Lumpkin claims that she was harmed by the false arrest of her husband, Alton Lumpkin. A married person has a right to recover for the loss of consortium, or loss of services, of the spouse. Alton Lumpkin's false arrest claim

survives summary judgment, and thus Ieshia Lumpkin's consortium claim survives as well.

        9.    <u>Punitive Damages</u>

Under Georgia law, "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). Punitive damages cannot be imposed without a finding of some form of culpable conduct. <u>Colonial Pipeline Co. v. Brown</u>, 258 Ga. 115, 118 (1988). Viewed in the light most favorable to the Plaintiffs, the evidence shows willful misconduct and malice. There is a genuine issue of material fact regarding whether punitive damages are appropriate.

## IV.  <u>Conclusion</u>

For the reasons set forth above, the Court DENIES the Defendants' Motion to Strike [Doc. 53] and GRANTS IN PART and DENIES IN PART the Defendants' Motion for Summary Judgment [Doc. 41].

SO ORDERED, this 2 day of October, 2012.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge